# EXHIBIT B

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION-CIVIL ACTIONS BRANCH**

**BRITTANY HONORA**
c/o Washington Legal Group, LLC
1001 Connecticut Ave NW #1138
Washington, District of Columbia 20036

2026-CAB-006385

**Plaintiff,** Civil Actions No. ____________________

v.

**TRANS UNION, LLC**
c/o Corporation Service Company
1156 15th St NW #605
Washington, DC 20005

**EXPERIAN INFORMATION SOLUTIONS, INC.**
c/o C T Corporation System
1015 15th St NW #1000
Washington, DC 20005

**EQUIFAX INFORMATION SERVICES, LLC**
c/o Corporation Service Company
1156 15th St NW #605
Washington, DC 20005

**Defendants.**

**COMPLAINT AND JURY DEMAND**

COMES NOW the Plaintiff, **BRITTANY HONORA**, by and through undersigned counsel, brings this Complaint against Defendants Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian") and Trans Union, LLC ("Transunion"), she alleges as follows:

1. This action is brought pursuant to the Federal Fair Credit Reporting Act (hereinafter "FCRA") 15 U.S.C. §1681 et seq.

2. This court has jurisdiction under 15 U.S.C. §1681p.

3. Venue is proper because the Defendant(s) are headquartered here and the offending conduct occurred in this district.

4. Plaintiff Brittany Honora is a consumer as defined by 15 U.S.C. § 1681a(c).

5. Defendants Equifax, Experian and Transunion are consumer reporting agencies ("CRAs") as defined by 15 U.S.C. § 1681a(f).

6. Ms. Brittany Honora is an employee of the federal government, which requires its employees to maintain a certain credit profile to hold a clearance.

7. In July 2025, Ms. Honora's employer reviewed her credit profile and admonished her that she needed to improve her payment history to maintain her clearance.

8. Shortly thereafter, Ms. Honora contacted creditors of *all* known delinquent debts and set up payment plans for those debts.

9. For each and every one of her debts, Ms. Honora is either making payments to the creditor or servicer of that debt or has already paid the debt in full.

***Discover Card, USAA and GS Bank Tradelines***

10. Ms. Honora pays her monthly payment obligation each month for her accounts with Discover Card, USAA and GS Bank.

11. Despite her payments on the accounts, the tradelines do not reflect she is making any payments, let alone regular monthly payments in the amount and time due.

12. In a blatant misrepresentation of the status and payment history on the accounts, each of the tradelines falsely represents that the accounts are uncollectible.

13. Ms. Honora disputed the tradelines with the CRAs.

14. The furnishers failed to conduct a reasonable investigation of Ms. Honora's dispute and represented to the CRAs that the disputed information was accurate based on their faulty investigation.

15. Further, the furnishers reported that accounts were not in dispute.

16. Instead of investigating Ms. Honora's disputes, the CRAs waited for the furnishers' dispute results, so the CRAs could blindly adopt those results.

17. Despite receiving numerous disputes from Ms. Honora regarding the tradelines, the CRAs did not clearly note that accounts were disputed by her *and* add a consumer statement to her credit files and reports.

18. Numerous third parties have already received and will continue to receive credit report that include the inaccurate tradelines.

19. The third parties that receive the CRAs' credit reports are misled into viewing Ms. Honora as a higher credit risk than she actually is.

20. Consequently, Ms. Honora does not qualify for certain credit that she desires and needs. And the inability to correct her credit report and thereby qualify for credit has caused Ms. Honora to suffer emotional distress.

***Unknown A&A Collection Account***

21. Appearing in her credit file for each CRA was a collection account furnished by debt collector Aldous & Associates (hereinafter, "A&A").

22. According to A&A collection account, the defendant claimed it was collecting a $13,450 debt for a joint account that Ms. Honora owed to Natura Gardens.

23. Ms. Honora has never contacted Natura Gardens much less had she opened a joint account and incurred a $13,450 obligation with the company.

24. Upon learning of A&A's claim that she owed such a debt, Ms. Honora called A&A to uncover the basis of the claim and to inform A&A that it had made a mistake.

25. The call between A&A and Ms. Honora was fruitless as A&A did not provide any information about the debt and did not agree to delete the debt from her report.

26. Either A&A withheld the information it had regarding the purported debt, or A&A had no information to convey to Ms. Honora about the debt.

27. In addition to calling A&A about the collection in her reports, Ms. Honora wrote to A&A to dispute the debt and request documentation on the same.

28. A&A responded to Ms. Honora with a letter stating it had verified she owed the debt *by contacting a completely different company, Colaw Fitness, regarding a gym debt, which is a completely different debt that was reported to Ms. Honora's credit files.*

29. Specifically, A&A stated, "we contacted the original creditor, Colaw Fitness, and are sending you a copy of all pertinent documents that created the obligation."

30. Not only did A&A identify a completely different company, but the debt amount was completely different. Specifically, the amount identified in A&A's letter was only $104.97—compared to the $13,450 that A&A reported as owed to it by Ms. Honora.

31. Ms. Honora disputed the A&A collection with each of the CRAs.

32. Enclosed with Ms. Honora's initial dispute was an FTC identity theft report that was fully and properly filled out by Ms. Honora.

33. Despite having no documentation to substantiate Ms. Honora had *any* debt obligation to A&A, the debt collector instructed the CRAs to continue listing the $13,405 debt as an obligation that Ms. Honora owed to A&A.

34. If the CRAs had maintained and/or implemented reasonable procedures to prepare accurate credit report for Ms. Honora, the A&A collection would have been flagged and never appeared in Ms. Honora's credit file.

35. Certainly after Ms. Honora pinpointed the error in her dispute letter to the CRAs, the erroneous A&A collection should have been removed immediately. Nonetheless,

the CRAs elected to continue reporting the A&A collection solely on the basis that A&A instructed them to do so.

36. From prior experience and dealings with A&A, the CRAs know that A&A is an unreliable source of information and particularly prone to reporting a consumer owes a debt that does not belong to the consumer.

37. Therefore, the CRAs knew they were running a high risk of defaming Ms. Honora when they decided to publish credit reports on Ms. Honora that included the erroneous A&A collection.

38. Not only did the CRAs fail to delete the collection account, but they failed to properly note debt was disputed by Ms. Honora. More specifically, rather than reporting that dispute had been processed by them and that Ms. Honora disagreed with their dispute results, they reported that the investigation of the dispute had not been completed.

39. Third parties that received Ms. Honora's credit reports have been misled into believing that she had an unpaid $13,450 debt obligation that went into collections. As a result, Ms. Honora has been perceived as being a higher credit risk than she actually is.

***Unknown Collection Account from MCM***

40. The CRAs are reporting a collection account furnished by Midland Credit Management (hereinafter, "MCM").

41. Ms. Honora has no obligation to pay MCM for any debt.

42. Although MCM knows that Ms. Honora does not owe it money, MCM reported to the CRAs that she did have obligations to pay it.

43. Upon information and belief, MCM is defaming Ms. Honora because such defamation will often lead a consumer to pay a debt that the consumer does not owe.

44. Ms. Honora disputed the collection directly with MCM wherein she requested MCM to provide proof that she owed a debt to it.

45. Further, she demanded that MCM cease its debt collection activity until it was able to establish that she owed a debt to it.

46. MCM failed to provide Ms. Honora with information that would establish that she owed a debt to it. MCM was unable to demonstrate she owed it any money because MCM did not purchase or obtain any debt from a creditor that she owed money.

47. Nonetheless, MCM continued and still continues to report to the CRAs that Ms. Honora is obligated to pay it for the invalid debt.

48. Even after receiving Ms. Honora's disputes of the collection, the CRAs continued to include the collection in Ms. Honora's credit reports.

49. After receiving Ms. Honora's dispute of the MCM collection, the CRAs should have immediately deleted the collection account.

50. MCM is notorious for reporting debts that debtor do not owe. In 2015 the Consumer Financial Protection Bureau sued MCM for, *inter alia*, collecting on "debts that were potentially inaccurate, lacking documentation, or unenforceable," and "threaten[ing] and deceiv[ing] consumers to collect on debts they should have known were inaccurate or had other problems."[1] And in 2020, the CFPB had to sue MCM again because it "violated the consent order by suing consumers without possessing required documentation, using law firms and an internal legal department to engage in collection efforts without providing

---

[1] https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-portfolio-recovery-associates-to-pay-more-than-24-million-illegal-debt-collection-practices-reporting-violations/)

required disclosures, **and failing to provide consumers with required loan documentation after consumers requested it.**"[2]

51. The CRAs' failure to cease reporting the collection was due to their failure to conduct a reasonable investigation of Ms. Honora's disputes.

52. Numerous third parties have already received and will continue to receive credit reports that include the three errant accounts.

53. The third parties that receive the CRAs' credit reports are misled into viewing Ms. Honora as a higher credit risk than she actually is.

54. Consequently, Ms. Honora does not qualify for certain credit that she desires and needs. And the inability to correct her credit report and thereby qualify for credit has caused Ms. Honora to suffer emotional distress.

***Amex, Capital One and CBNA Tradelines***

55. Ms. Honora had debts with American Express ("Amex"), Capital One and Citibank that were charged off and subsequently paid in full. None of the CRAs reported the payments by Ms. Honora that resulted in the accounts to be paid in full.

56. In addition to misrepresenting the payment history, Equifax also reported the status of the three accounts as unpaid charge-offs.

57. Regarding the Capital One and Citibank tradelines, the CRAs further misrepresented the status of the accounts by either reporting Ms. Honora did not dispute the account or that her dispute had been resolved—and no longer in dispute.

[2] https://www.consumerfinance.gov/archive/newsroom/consumer-financial-protection-bureau-settles-lawsuit-debt-collectors-and-debt-buyers-encore-capital-group-midland-funding-midland-credit-management-and-asset-acceptance-capital-corp/

58. The CRAs should have easily identified and corrected the errors before including the errant Amex and Capital One tradelines in Ms. Honora's credit reports.

59. On a routine basis the CRAs disseminate credit reports on Ms. Honora to third parties that are misled about her payment history and the status of the Amex and Capital One accounts.

60. Ms. Honora disputed the Amex, Capital One and Citibank tradelines.

61. The furnishers processed Ms. Honora's disputes by checking the CRAs' files to make sure the CRAs' records matched the information they furnished to the CRAs.

62. None of the furnishers investigated Ms. Honora's dispute(s) with the goal of verifying the accuracy and completeness of the disputed information.

63. Instead, they merely sought to assure the previously furnished information to the CRAs was being reported *consistently* by the CRAs regardless of the accuracy or completeness of that information.

64. The CRAs did not investigate Ms. Honora's disputes at all.

65. Rather than investigating Ms. Honora's dispute(s), the CRAs forwarded her disputes to furnishers and waited to receive their responses to the dispute(s).

66. The furnishers conveyed their dispute results to the CRAs and the CRAs accepted the dispute results without considering the merits of Ms. Honora's position.

67. Numerous third parties have already received and will continue to receive inaccurate and defamatory credit reports on Ms. Honora that are published by CRAs.

68. The third parties that receive the CRAs' credit reports are misled into viewing Ms. Honora as a higher credit risk than she actually is.

69. Consequently, Ms. Honora does not qualify for certain credit that she desires and needs. And the inability to correct her credit report and thereby qualify for credit has caused Ms. Honora to suffer emotional distress.

***Tradelines Furnished by NFCU***

70. Ms. Honora has three Navy Federal Credit Union (hereinafter, "NFCU") accounts, including an open credit card, closed auto loan, and closed consolidation loan.

71. The two closed accounts are reporting delinquency status. Specifically, the auto loan reports as 30 days late and the consolidation loan reports as 90 days late. These delinquency markers appear in the status field.

72. These reported delinquent status of the accounts is contradicted by the reported payment history of the accounts.

73. More specifically, the payment history for the auto loan contains no late payments, much less a current delinquency. With respect to the consolidation loan, the payment history clearly shows the account was never 90 days late.

74. Based on the reported payment history, the CRAs knew the reported status was inaccurate for the auto and consolidation loan.

75. If the CRAs maintained and implemented reasonable procedures for preparing accurate credit reports, then the CRAs would have flagged the contradictory reporting and prevented the inaccuracy from appearing in Ms. Honora's credit reports.

76. Ms. Honora disputed the NFCU tradelines with the CRAs.

77. Each CRA notified NFCU of Ms. Honora's dispute(s).

78. NFCU processed Ms. Honora's disputes by checking the CRAs' files to make sure the CRAs' information matched the information they were furnishing to the CRAs.

79. NFCU did not investigate Ms. Honora's dispute(s) with the goal of verifying the accuracy and completeness of the disputed information.

80. Had NFCU checked its payment and/or servicing records, then NFCU would have discovered the accounts were inaccurate.

81. However, NFCU did not check its payment or servicing records. Instead, NFCU checked its credit reporting records, which were inaccurate, and merely assured the information in those *inaccurate* records matched the records of the CRAs.

82. Except for forwarding Ms. Honora's dispute to NFCU, the CRAs took no action at all with respect to her dispute.

83. When the CRAs notified NFCU of Ms. Honora's dispute, they assigned a general dispute code to her dispute. Importantly, the dispute code is not meant to be the only descriptor used when notifying a furnisher of a dispute.

84. The dispute system used by the CRAs has a field for the CRAs to provide a more specific description of the dispute. However, in order to provide an adequate description of the dispute, the CRAs must carefully read the consumer's letter to gain a sufficient understanding to describe the dispute in more detail.

85. Although reading a consumer's dispute letter would only take minutes, the CRAs do not allocate their dispute investigators time to carefully read the consumer's letter.

86. Once NFCU completed its unreasonable investigation, it reported its dispute results to the CRAs, who accepted the dispute results without seriously considering the points and issues raised by Ms. Honora in her dispute letter.

87. Further, the CRAs accepted NFCU dispute results without attempting to reconcile the contradictory information between the payment history and status.

88. The third parties that receive the CRAs' credit reports are misled into viewing Ms. Honora as a higher credit risk than she actually is.

89. Consequently, Ms. Honora does not qualify for certain credit that she desires and needs. And the inability to correct her credit report and thereby qualify for credit has caused Ms. Honora to suffer emotional distress.

## CAUSE OF ACTIONS

### COUNT I
### VIOLATIONS OF THE FCRA 15 U.S.C. § 1681e(b)

90. Section 1681e(b) of the FCRA requires CRAs to follow reasonable procedures to assure maximum possible accuracy of any consumer report that they prepare.

91. The CRAs violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files they published concerning Plaintiff.

92. Equifax violated 15 U.S.C. § 1681e(b) by preparing consumer reports on Plaintiff that inaccurately identified the MCM collection as a credit account.

93. On information and belief, Equifax religiously reports collection accounts for certain debt collectors (e.g. MCM) as credit accounts, which implies the debtor obtained and defaulted on an additional loan.

94. Either MCM reports to Equifax that its debts are credit accounts, or Equifax is reporting the collection accounts as credit accounts due to a defect in Equifax's software.

95. Regardless, Equifax knows it is inaccurately reporting collection accounts as credit accounts and refuses to implement procedures to correct this well-known error.

96. Equifax believes it can get away with this illegal conduct because its' victims are marginalized people without the resources to challenge Equifax.

97. Equifax's deliberate choice to knowing report inaccurate information was a willful and/or reckless violation of the FCRA

98. As a result of the CRAs' violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: reduced credit score, lost credit opportunities, irritability, depression and anxiety, loss of appetite, stomach pain, nausea, headaches, chest pain and tightness, sleep loss, feelings of fear, feelings of shame, difficulty concentrating, embarrassment and humiliation and harm to reputation.

99. The violations by CRAs were willful, rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, they were negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

100. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from the CRAs in amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT TWO**
**VIOLATIONS OF THE FCRA 15 U.S.C. § 1681g**

101. Pursuant to 15 U.S.C. § 1681g(a)(1), CRAs must provide a consumer with all information in the consumer's file upon request from the consumer.

102. Defendant Equifax violated 15 U.S.C. § 1681g(a)(1), by failing to provide the Plaintiff with all information in his file after he requested it.

103. Equifax violated § 1681g(a)(1) by failing to provide Plaintiff with the original creditor name for certain collection accounts.

104. Equifax knows that it is required to report the original creditor's name and its' failure to do so will cause consumers not to recognize the account.

105. Notably, the two other national consumer reporting agencies, Experian and Trans Union, have abided by the CDIA's edicts and implemented procedures that assure the original creditor name is included in all collection accounts that appear in their reports.

106. According to the Consumer Data Industry Association ("CDIA"), the industry leading organization for furnishers and consumer reporting agencies, the "original creditor is required for collection agencies" and "must be present each time the account is reported."

107. Further, the CDIA states the "purpose of reporting the original creditor name is to help consumers identify the source of accounts when they appear on credit reports."

108. Continuing, the CDIA notes that "[w]ithout the original creditor names, consumers may not know what the accounts represent."

109. Upon information and belief, Equifax's failure to disclose the original creditor is due to a defect in Equifax's software that lists collection accounts in the wrong section of the report wherein accounts are displayed in formats for credit accounts that do not have a Metro II field for an original creditor.

110. Equifax continues to knowingly omit the original creditor's name because Equifax does not want to incur the costs of fixing the defect in its software.

111. Equifax has conducted a cost-benefit analysis on whether to incur the costs to fix the error or to apportion a small percentage of those would-be costs to litigating claims brought by aggrieved consumers that fell victims to its conduct.

112. In choosing to litigate rather than correct, Equifax was motivated to adopt and act on an interpretation of section 1681g that gave it grounds to litigate a defense against claims that consumers were bound to bring against Equifax for its intentional violations of the FCRA.

113. Because the language in section 1681g and the obligations of a credit reporting agency that arise from the said language are unambiguous, to give cover to an otherwise indefensible defense, Equifax had to purposely adopt a reading of § 1681g that contravened the clear objective and instruction of the statute.

114. To achieve its purpose of adopting an interpretation of § 1681g that gave it cover and/or plausible denial, Equifax reads in an accuracy obligation in § 1681g where there is absolutely no language to support such reading.

115. Specifically, while the statue clearly reads "All information in the consumer's file at the time of the request" must be "clearly and accurately disclose[d] to the consumer," § 1681g(a)(1)(A), Equifax claims that § 1681g only covers inaccurate information.

116. The Supreme Court has instructed that entities governed by FCRA to steer away from interpretations of the FCRA that have no foundation based in the language of the statute. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007).

117. There is no language in § 1681g to support Equifax's interpretation that § 1681g governs only information that is inaccurate.

118. Further, the Supreme Court has instructed anyone governed by the FCRA to heed the warnings and/or holdings of the circuit courts of appeals when it comes to interpreting duties under the FCRA. And the Second Circuit stated, albeit in an unpublished opinion, that "§ 1681g requires consumer reporting agencies to 'clearly and accurately disclose ... [*a*]*ll* information,' not *all accurate information*." *Selvam v. Experian Information Solutions, Inc.*, 651 Fed. Appx. 29, 33 (2d Cir. 2016) (citing 15 U.S.C. § 1681g(a) (emphasis in original).

119. The *Selvam* opinion was rendered in 2016, so Equifax has been on notice, from the 2nd Circuit, that its interpretation of section 1681g(a) was inaccurate for 10 years.

120. Additionally, during that same period, in 2015, Equifax was sued by 30+ state attorney generals for, among other things, failing to report the original creditor. More particularly, as a result of the state attorneys' litigation, Equifax agreed to "revise training materials and adopt policies and procedures to notify and instruct Collection Furnishers that the name of the Original Creditor ... [is a] mandatory reporting requirement[], and [Equifax] shall reject data that is not provided with the name of the Original Creditor."[3]

121. Moreover, Equifax has *direct* knowledge that its decision to omit the identity of original creditors when reporting a collection account is causing serious harm to consumers. In a recent lawsuit in the Middle District of Florida, Equifax admitted that its failure to report the name of the original creditor in collection accounts has led to "numerous other lawsuits filed against Equifax." *Clarke v. Equifax Information Services, LLC*, No. 8:25-cv-01499, ECF No. 20, fn. 1 (M.D. Fla. Oct. 1, 2025) (citing *Aguirre v. Equifax Info. Services LLC*, 0:25-cv-61099 (S.D. Fla. June 3, 2025); *Williams El v. Equifax Info. Services LLC*, No. 8:25-cv-01930 (D. Md. June 16, 2025); *Madaris v. Equifax Info. Servcs LLC et al.*, No. 1:25-cv-00503 (S.D. Ohio June 17, 2025).

122. And based on a review of Pacer for cases filed against Equifax, consumers have been suing Equifax for failing to disclose the original creditor for several years now.

123. Considering Equifax has not corrected this error after being sued by consumers for many years, the costs of litigating these lawsuits for Equifax have not been sufficient enough to deter it from violating the FCRA.

---

[3] https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx

124. Therefore, a substantial punitive damages award is in tow to be levied against Equifax so that it is deterred from violating the FCRA in the future.

125. As a result of Equifax's conduct, action, and inaction, Plaintiff suffered damage as alleged above, including by example only and without limitation: deprived of important information, hampered ability to correct errors in his report, cost and time to search for the withheld information, frustration and anxiety, feelings of fear, feelings of worry, embarrassment and humiliation, and other emotional and mental distress.

126. The violations by Equifax were willful, rendering Equifax liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Equifax was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

127. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorney's fees from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT III**
**VIOLATIONS OF THE FCRA 15 U.S.C. § 1681i**

128. The CRAs violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation and delete information that was not verified as accurate and complete.

129. The CRAs violated 15 U.S.C. § 1681i by failing to review and consider all relevant information included in Plaintiff's disputes.

130. The CRAs violated 15 U.S.C. § 1681i by failing to provide proper and sufficient notice of Plaintiff's disputes to the furnishers of information disputed by the Plaintiff.

131. The CRAs violated 15 U.S.C. § 1681i by failing to promptly delete or modify the disputed information that was found to be inaccurate, incomplete or unverifiable.

132. The CRAs violated 15 U.S.C. § 1681i by failing to clearly note disputed accounts as disputed by Plaintiff and failing to add and/or include Plaintiff's statement of dispute or a clear and accurate codification or summary thereof.

133. As a result of the CRAs' violations of 15 U.S.C. § 1681i, Plaintiff suffered actual damages, including but not limited to: reduced credit score, lost credit opportunities, irritability, depression and anxiety, loss of appetite, stomach pain, nausea, headaches, chest pain and tightness, sleep loss, feelings of fear, feelings of shame, difficulty concentrating, embarrassment and humiliation and harm to reputation.

134. The CRAs' failure to comply with 15 U.S.C. § 1681i is due to their decision to prioritize making substantial profits over complying with their duties under the FCRA.

135. Consequently, the CRAs have implemented policies and procedures that are not adequate to comply with their duties under the FCRA.

136. The CRAs have performed a cost-benefit analysis of complying with the FCRA and determined implementing policies and procedures that comply with the FCRA is more expensive than litigating lawsuits for their failures to comply with the FCRA.

137. The CRAs have purposely adopted incorrect interpretations of the FCRA when developing their policies and procedures for complying with the FCRA because they decided that the costs of FCRA compliance will be too costly to their profit ambitions.

138. The CRAs have ignored the holdings of the Circuit Courts of Appeals because the CRAs would lose profits if they adhered to those opinions and holdings.

139. The CRAs are some of the most profitable companies in the United States. If the CRAs were not overly obsessed with making substantial profits, they could easily budget money and allocate sufficient resources that are necessary and adequate to comply with their statutory duties under the FCRA.

140. The CRAs' actions were intentional or reckless, both which amount to a willful violation, rendering the CRAs liable pursuant to 15 U.S.C. § 1681n. Alternatively, the CRAs were negligent, which entitled Plaintiff to recover under 15 U.S.C. § 1681o.

141. Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from the CRAs in amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## JURY DEMAND

142. Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, your Plaintiff demands judgment for actual, statutory and punitive damages against Defendants; for her fees and costs; for prejudgment and post-judgment interest; and any other relief deemed appropriate by this Court.

TRIAL BY JURY IS DEMANDED

Dated: September 10, 2026

Respectfully submitted,

BRITTANY HONORA

/s/ Jeffery W. Styles
Jeffery W. Styles (No. 475264)
Washington Legal Group, LLC
1001 Connecticut Ave NW #1138
Washington, DC 20036
Telephone: (240) 503-1708
jstyles@washlegal.com

Attorney for Plaintiff